# United States Court of Appeals
# for the Federal Circuit

---

**NUCOR CORPORATION,**
*Plaintiff-Appellant*

**ARCELORMITTAL USA LLC, AK STEEL
CORPORATION, UNITED STATES STEEL
CORPORATION,**
*Plaintiffs*

**v.**

**UNITED STATES, GOVERNMENT OF KOREA,**
*Defendants-Appellees*

**DONGKUK STEEL MILL CO., LTD.,**
*Defendant*

---

2018-1787

---

Appeal from the United States Court of International
Trade in No. 1:16-cv-00164-CRK, Judge Claire R. Kelly.

---

Decided: June 21, 2019

---

ROBERT E. DEFRANCESCO, III, Wiley Rein, LLP, Washington, DC, argued for plaintiff-appellant. Also represented by TIMOTHY C. BRIGHTBILL, TESSA V. CAPELOTO, LAURA EL-SABAAWI, ALAN H. PRICE, ADAM MILAN TESLIK, MAUREEN E. THORSON, CHRISTOPHER B. WELD.

LOREN MISHA PREHEIM, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by ELIZABETH ANNE SPECK, CLAUDIA BURKE, JEANNE DAVIDSON; CATHERINE D. MILLER, Office of Chief Counsel for Trade Enforcement and Compliance, Department of Commerce; CHAD A. READLER, Civil Division, U.S. Department of Justice.

JEFFREY M. WINTON, Law Office of Jeffrey M. Winton PLLC, Washington, DC, argued for defendant-appellee Government of Korea. Also represented by YOUNGJAE KIM, Economic Section, Embassy of the Republic of Korea.

_____

Before LOURIE, REYNA, and TARANTO, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* TARANTO.
  Opinion dissenting filed by *Circuit Judge* REYNA.

TARANTO, *Circuit Judge*.

In 2016, the U.S. Department of Commerce issued its final determination in its investigation into whether the Government of Korea had provided, to Korean producers and exporters of certain corrosion-resistant steel products (CORE), subsidies warranting imposition of countervailing duties on the products when imported into the United States. Nucor Corporation and other U.S. producers of CORE, which had requested the investigation, alleged that the Korean government, during the period of investigation (Jan. 1, 2014–Dec. 31, 2014), had provided subsidies to Korean CORE producers through its sale of electricity to them. Commerce found no such electricity-sale subsidy, while finding some other subsidies. The Court of International Trade affirmed Commerce's finding as to electricity sales. *Nucor Corp. v. United States*, 286 F. Supp. 3d 1364 (Ct. Int'l Trade 2018). In this appeal by

Nucor, we reject a broad legal position advanced by Commerce in defending its decision, but we find no reversible error in the Commerce decision. We therefore affirm.

I

In June 2015, acting on petitions from Nucor and other U.S. producers of CORE, Commerce initiated a countervailing-duty investigation under 19 U.S.C. § 1671 *et seq.* into certain CORE products from Korea. *See Certain Corrosion-Resistant Steel Products from the People's Republic of China, India, Italy, the Republic of Korea, and Taiwan*, 80 Fed. Reg. 37,223 (Dep't of Commerce June 30, 2015) (*Initiation Decision*).[1] In November 2015, Commerce issued a Preliminary Affirmative Determination supporting *de minimis* or small subsidy rates, *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary Affirmative Determination*, 80 Fed. Reg. 68,842 (Dep't of Commerce Nov. 6, 2015), based on the analysis set forth in its Decision Memorandum for the Preliminary Affirmative Determination, J.A. 8889–917 (*Preliminary Determination Memo*). Commerce issued its final determination in June 2016, continuing to assign *de minimis* or small subsidy rates. *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 81 Fed. Reg. 35,310 (Dep't of Commerce June 2, 2016) (*Final Determination*). The *Final Determination* relies for its reasoning on Commerce's Issues and Decision Memorandum for the Final Determination, J.A. 9006–45 (*Final Determination Memo*).

---

[1] Nucor is the only appellant in this court. We hereafter omit reference to its co-petitioners even when describing stages of the proceeding at which they appeared alongside Nucor.

Under the statutes governing Commerce's investigation, Congress is to impose a countervailing duty on merchandise imported into the United States if "a government is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of that merchandise." *Delverde, SrL v. United States*, 202 F.3d 1360, 1365 (Fed. Cir. 2000); *see* 19 U.S.C. § 1671(a)(1). The key statutory language for present purposes is language that originated in the Uruguay Round Agreements Act [URAA], Pub. L. No. 103-465, 108 Stat. 4809 (1994). The relevant provisions declare: *first*, one form of "countervailable subsidy" exists when a government "authority" sells "goods or services" on terms such that "a benefit is thereby conferred"; *second*, a "benefit shall normally be treated as conferred" when the goods or services sold "are provided for less than adequate remuneration"; and *third*, "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided . . . in the country which is subject to the investigation," with "[p]revailing market conditions includ[ing] price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(A)–(B), (D)–(E); *see Delverde*, 202 F.3d at 1365−66.[2]

Commerce addressed several issues in the proceeding. The issue in dispute here involves Nucor's assertion that an authority of the Korean government was selling

---

[2]    An "authority" is "a government of a country or any public entity within the territory of the country." 19 U.S.C. § 1677(5)(B). A "countervailable subsidy" includes a subsidy "in the case in which an authority" "provides a financial contribution" to a person "and a benefit is thereby conferred." § 1677(5)(A), (B). A "financial contribution" includes "providing goods or services, other than general infrastructure." § 1677(5)(D)(iii).

electricity to Korean CORE producers for "less than adequate remuneration," the standard of 19 U.S.C. § 1677(5)(E)(iv). Commerce rejected that contention.

Commerce focused on the Korea Electric Power Corporation (KEPCO) as the seller of electricity to users in Korea, including the CORE producers at issue. Commerce found that KEPCO is an "authority" of the Government of Korea, citing the Korean government's ownership of and control over KEPCO and the Korean government's regulation and approval of KEPCO's prices. *Preliminary Determination Memo*, J.A. 8906−07. Commerce also found that KEPCO is "the primary utility company in Korea providing electricity to Korean consumers" and that only "a minimal amount of electricity is supplied directly to consumers on a localized basis by independent power producers." J.A. 8907.

In determining whether KEPCO sold electricity to the Korean CORE producers for "less than adequate remuneration," Commerce applied a regulation, 19 C.F.R. § 351.511, that it had adopted in 1998 to guide application of that statutory standard. *See Countervailing Duties*, 63 Fed. Reg. 65,348 (Nov. 25, 1998) (final rule). The regulation states that "where goods or services are provided, a benefit exists to the extent that such goods or services are provided for less than adequate remuneration." 19 C.F.R. § 351.511(a)(1) (citing 19 U.S.C. § 1677(5)(E)(iv)). It then sets forth three methods of answering the question, in order of preferred approach, under the heading "'Adequate Remuneration' defined." *Id.* § 351.511(a)(2).

The first two methods call for inquiry into how the sale prices at issue compare to either of two "market" prices: either (i) a "market-determined price" based on actual transactions in the country or (ii) a "world market price" that would be available to the purchasers in the country. *Id.*,

§ 351.511(a)(2)(i)–(ii).[3]  Commerce found that neither of those potential bases of comparison was available here— the first, which looks for *competitive*-market prices, because KEPCO's dominant market role means that "prices within the country are distorted and cannot be used for

---

[3]    Subparagraphs (i) and (ii) read:

(i)  In general.  The Secretary will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question.  Such a price could include prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions.  In choosing such transactions or sales, the Secretary will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability.

(ii) Actual market-determined price unavailable.  If there is no useable market-determined price with which to make the comparison under paragraph (a)(2)(i) of this section, the Secretary will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question.  Where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability.

19 C.F.R. § 351.511(a)(2)(i)–(ii).

benchmark purposes," J.A. 8907; the second because "there is no cross-border transmission or distribution of electricity in Korea," J.A. 8908. The absence of the two regulatory market-price bases for comparison is not disputed in this court.

Commerce therefore turned to the regulation's residual provision, which applies when the specified market prices are not available for comparison and which requires assessment of "whether the government price is consistent with *market principles*." 19 C.F.R. § 351.511(a)(2)(iii) (emphasis added).[4] Both in the *Preliminary Determination Memo* and in the *Final Determination Memo*, Commerce found that KEPCO's prices to the Korean CORE producers met that standard. J.A. 8908−10,9023−31. In particular, in the *Final Determination Memo*, Commerce found that KEPCO uses a tariff schedule and that the CORE producers paid prices consistent with that tariff schedule, so they were not the beneficiaries of preferential price treatment. J.A. 9023–25. Significantly, Commerce then also addressed KEPCO's costs, concluding that Nucor had "failed to adequately support a claim that KEPCO's costs of electricity used in developing its tariff schedule do not fully reflect its actual costs of the electricity that it transmits and distributes to its customers in Korea." J.A. 9028.

---

[4] Subparagraph (iii) reads:

(iii) World market price unavailable. If there is no world market price available to purchasers in the country in question, the Secretary will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles.

19 C.F.R. § 351.511(a)(2)(iii). A fourth subparagraph provides for certain adjustments to comparison prices, but that subparagraph has not been invoked in this appeal.

Commerce found that "KEPCO's standard pricing mechanism used to develop its tariff schedule was based upon its costs." *Id.* It elaborated:

> To develop the electricity tariff schedules that were applicable during the [period of investigation], KEPCO first calculated its overall cost, including an amount for investment return. This cost includes the operational cost for generating and supplying electricity to the consumers as well as taxes. The cost for each electricity classification was calculated by (1) distributing the overall cost according to the stages of providing electricity (generation, transmission, distribution, and sales); (2) dividing each cost into fixed cost, variable cost, and the consumer management fee; and (3) then calculating the cost by applying the electricity load level, peak level, and the patterns of consuming electricity. Each cost was then distributed into the fixed charge and the variable charge. KEPCO then divided each cost taking into consideration the electricity load level, the usage pattern of electricity, and the volume of the electricity consumed. Costs were then distributed according to the number of consumers for each classification of electricity. For the [period of investigation], KEPCO more than fully covered its cost for the industry tariff applicable to [the Korean producer] respondents.

*Id.* (footnotes omitted).

Commerce made one other point—that its analysis of costs did not include the costs of generating (as opposed to transmitting and distributing) electricity. *Id.* It explained:

> [W]ith respect to the costs of the generators, including the nuclear generators, [Commerce] did not request these costs because the costs of electricity to KEPCO are determined by the KPX [Korean Power Exchange]. Electricity generators sell electricity to

the KPX, and KEPCO purchases the electricity it distributes to its customers through the KPX. Thus, the costs for electricity are based upon the purchase price of electricity from the KPX, and this is the cost that is relevant for KEPCO's industrial tariff schedule.

*Id.* (footnote omitted).

In the Court of International Trade, as relevant here, Nucor challenged Commerce's method of analyzing KEPCO's prices as contrary to the "less than adequate remuneration" statutory standard and the "consistent with market principles" regulatory standard. The Court of International Trade rejected the contention, *Nucor*, 286 F. Supp. 3d at 1369−75, 1377−80, relying in part on an earlier decision indicating that, where market prices are unavailable for comparison, the statutory and regulatory standard may be found satisfied simply by finding that the producer at issue was not receiving "a preferential rate"—meaning a nondiscriminatory rate—as long as the rate was "set by a consistent [and] discernible method," *Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1306−07 (Ct. Int'l Trade 2017). Nucor also challenged Commerce's focus only on KEPCO's prices in relation to its costs, when, Nucor argued, Commerce should also have considered KPX's prices in relation to KPX's own costs. The Court of International Trade declined to address that contention on its merits, concluding that Nucor was arguing that KPX should have been included in the "authority" whose prices were being analyzed and that Nucor had failed to exhaust that argument by properly presenting it in the proceeding before Commerce. *Id.* at 1375−77.

Nucor appeals. We have jurisdiction under 28 U.S.C. §§ 1295(a)(5), 2107, and 2645(c).

II

We review Commerce's decision using the same standard of review applied by the Court of International Trade. See *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1310 (Fed. Cir. 2017). We review Commerce's decision to determine if it is "unsupported by substantial evidence on the record[] or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see Diamond Sawblades*, 866 F.3d at 1310; *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005).

Our review of Commerce's interpretation of a statutory provision is governed by the two-part framework set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). If Congress has unambiguously answered the question before the Court, the congressional answer controls. *See id.* at 842–43. But if Congress has not thus answered the question, the court must consider "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. As to consistency of the agency position with the statute, the Supreme Court has stated that, in applying *Chevron*, "the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). It follows, as the Court has further explained, that even when a statutory term is sufficiently ambiguous or general so as not to resolve all questions about its meaning, an agency interpretation must still be a reasonable choice within the range permitted by the statutory words. *See Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 321 (2014); *see also MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 229 (1994) ("[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear . . . .").

To the extent that Commerce's regulation is at issue here, Commerce does not invoke any principle of deference to govern our inquiry into whether its interpretation is not in accordance with law.

## III

Nucor's principal argument takes Commerce's focus on *only* KEPCO's prices and costs as a given and challenges Commerce's decision that KEPCO's prices to the relevant Korean CORE producers were not for less than adequate remuneration. In this court, Commerce defends its decision on essentially two bases. First, Commerce suggests that it suffices for compliance with the statutory and regulatory standard, where market prices are not available for comparison, that the foreign government authority not be charging the producer at issue "a preferential rate." This argument treats "preferential rate" as meaning that the rate is set by a "consistent and discernible method" and does not reflect "price discrimination." U.S. Br. 25–28 (relying on *Maverick* formulation); Oral Arg. at 22:22–23:19. Second, more narrowly, Commerce defends its decision in this case as consistent with the statute and regulation because Commerce found not only that KEPCO's pricing was non-discriminatory but also that the pricing ensured cost recovery. U.S. Br. 42–52. We reject the first position, but we conclude that Nucor has not shown error in the second.

## A

We consider Commerce's broad theory in the context presented—where a foreign government authority is selling a good or service to a relevant producer in a country where no competitive-market prices are available to use as comparisons to assess the authority's prices. We hereafter assume, without repeating, those premises. Under Commerce's broad theory, if the foreign government authority engaged in a uniform, non-discriminatory, tariffed practice of charging a price so low that the authority consistently lost large sums of money in a way no private seller could

sustain, sales pursuant to that practice would *not* be properly viewed as for "less than adequate remuneration." That position is beyond any reasonable interpretation of the statute, or of its implementing regulation.

1

We begin with the ordinary meaning of the language at issue. A general dictionary from 1992 defines "remuneration" as "[s]omething, such as a payment, that remunerates" and gives the primary definition of "remunerate" as "[t]o pay (a person) a suitable equivalent in return for goods provided, services rendered, or losses incurred; recompense." *American Heritage Dictionary* 1527 (3d ed. 1992). A notion similar to "suitable equivalent" is evident in *Black's Law Dictionary* (6th ed. 1990). What we think is the most relevant definition of "remuneration" in that dictionary is "compensation," *id.* at 1296 (also listing "[p]ayment," "reimbursement," "[r]eward," "recompense," "salary"), which is defined in terms, among others, of "giving an equivalent or substitute of equal value" and "remuneration," *id.* at 283; and "adequate compensation" is defined with reference to eminent-domain and just-compensation standards as "[j]ust value of property taken" or "[m]arket value of property when taken," *id.* at 39.

Those definitions convey a familiar notion of payment of an amount that reflects the value of what is being paid for (*e.g.*, what was received, lost, or taken). The definitions do not invoke a notion of nondiscrimination as part of the equivalence concept; more pointedly, they do not suggest that nondiscrimination suffices for value equivalence. In a decision (cited by the government here) that was issued not long after the 1994 adoption of the statutory phrase at issue, Commerce confirmed that nondiscrimination does not itself constitute "adequate remuneration"—which Commerce said referred to "a market-based price." *Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. 43,186, 43,196 (Dep't of Commerce Aug. 17, 2001).

Commerce explained that "[p]referentiality is a measure of price discrimination," which "cannot be said to measure adequate remuneration," and under the 1994 statutory language, "[i]t is no longer sufficient to say that the government does not discriminate among buyers. Rather, . . . we must determine whether the government is receiving adequate remuneration, i.e., a market-based price." *Id.*

This distinction has long been recognized outside the present context. For more than a hundred years, laws regulating the rates charged by utilities or common carriers have *separately* stated requirements that rates be nondiscriminatory and that rates be "just and reasonable," *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 477−78 (2002), with the latter performing the role of "navigating the straits between gouging utility customers and confiscating utility property," *id.* at 481.[5] The "just and reasonable" rule prevented confiscation through a variety of methods involving value and cost, not by simply ensuring nondiscrimination. *Id.* at 477−89. And the prevention of confiscation by ensuring recovery of value or cost was described by the Supreme Court in several decisions using the language of guaranteeing adequate remuneration. *Newton v. Consolidated Gas Co. of N.Y.*, 259 U.S. 101, 105 (1922); *Minneapolis, St. P. & S.S.M. Ry. Co. v. Washburn Lignite Coal Co.*, 254 U.S. 370, 370, 372 (1920); *Northern Pac. Ry. Co. v. North Dakota ex rel. McCue*, 236 U.S. 585, 602, 605 (1915); *Ill. Cent. R. Co. v. ICC*, 206 U.S. 441, 446 (1907); *Atlantic Coast Line R. Co. v. N.C. Corp.*, 206 U.S. 1,

---

[5]    A tariff was the "classic" method of implementing rate regulation. *Verizon*, 535 U.S. at 478. A tariffed rate was itself generally required to be nondiscriminatory, *see id.*; *L.T. Barringer & Co. v. United States*, 319 U.S. 1, 5–10 (1943), but requiring that sales adhere to tariffs was the primary way of protecting against discrimination, *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 229–30 (1994).

19, 25 (1907); *Chesapeake & Potomac Tel. Co. v. Manning*, 186 U.S. 238, 249 (1902).

Thus, the words used in the statute, understood in their ordinary sense and against the background of general usage in the law, make it unreasonable to deem mere lack of discrimination sufficient to establish adequacy of remuneration, as Commerce's broad position does.

2

"[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Here, the statutory context of "less than adequate remuneration" reinforces the conclusion that the words themselves support.

The adequacy-of-remuneration language gives meaning to a provision that asks whether a producer is receiving a "benefit" from a government authority (through sales of goods or services), as part of the definition of what counts as a "subsidy." 19 U.S.C. § 1677(5)(A), (B). The express point of the subsidy determination is to specify when U.S. firms need the protection of a countervailing duty, which Commerce is directed to impose if a defined subsidy exists. 19 U.S.C. § 1671. As a logical matter, when the statutory purpose is borne in mind, the existence of a "benefit" of an unjustifiably low price, creating a "subsidy" to the producer or exporter, cannot depend on finding that the producer is being discriminatorily favored compared to others in the exporting country. The harm to U.S. firms does not depend on such discrimination within the exporting country.

No different conclusion is suggested by the command that adequacy be determined "in relation to prevailing market conditions." 19 U.S.C. § 1677(5)(E)(iv). That language does not endorse the charging of consistently low prices that no market participant could sustain, *i.e.*, prices

that would not constitute "adequate remuneration" under the ordinary meaning of those words. At most it directs attention to any competitive-market prices, as reflected in Commerce's regulation making market prices the primary tool of analysis if available, and to the complex of "conditions" relevant to assessing prices charged, as immediately explained in the next textual phrase: "price, quality, availability, marketability, transportation and other conditions of purchase or sale." *Id.*[6]

### 3

The origin of the statutory language at issue makes it especially clear that the government's position is contrary to the statute. The 1994 URAA specifically replaced the previous statutory standard, which focused the inquiry on whether a rate was nondiscriminatory, as opposed to simply too low by some measure, and which made being nondiscriminatory sufficient, largely if not always, to give a pass to sales prices not targeted at exports. The government's treatment of nondiscrimination as sufficient (if adopted pursuant to a consistent, discernible method) is

---

[6]  In *Certain Software Lumber Products from Canada*, 66 Fed. Reg. at 43,193, Commerce said that "the adequacy of remuneration must be measured by reference to the marketplace free of government interference." Taken out of context, that statement might suggest that a government authority's price is for less than adequate remuneration—leading to a countervailing duty—whenever the price was less than a supracompetitive, high price that a private unregulated monopolist would likely charge. Commerce may sensibly reject such a view. In the present matter, Commerce treated the two comparison-price methods as referring to *competitive* market prices, not prices in unregulated monopolist markets.

counter to the change Congress was making in altering the pre-1994 standard.

Before 1994, the statutory definition of "subsidy" included, as relevant here, "[t]he following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises": "[t]he provision of goods or services at preferential rates." 19 U.S.C.A. § 1677(5)(A)(ii)(II) (1993); *see* 19 U.S.C. § 1677(A)(ii)(II) (1988); *IPSCO, Inc. v. United States*, 899 F.2d 1192, 1195 (Fed. Cir. 1990). Under that pre-1994 law, "the provision of a good or service was a benefit if it was provided at preferential rates." *Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. at 43,196. It was precisely that language, with its preferential-rates requirement for triggering imposition of countervailing duties, that the 1994 URAA eliminated from the statute and replaced with the new language of "less than adequate remuneration" in 19 U.S.C. § 1677(5)(E)(iv).

Congress itself highlighted the significance of this change. Recognizing the need for interpretive guidance, Congress approved the Statement of Administrative Action in the URAA, § 101(a), 108 Stat. at 4814, and declared that it "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the [URAA]," 19 U.S.C. § 3512(d). The Statement of Administrative Action states plainly: "[C]urrent law relies on a standard of 'preferentiality' to determine the existence and amount of a benefit. [Section 1677(5)(E)(iv] *replaces this standard* with the standards from Article 14 of the Subsidies Agreement—'less than adequate remuneration.'" Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1, at 927 (1994),

*reprinted in* 1994 U.S.C.C.A.N. 4040, 4240 (emphasis added).[7]

This authoritative interpretation confirms what the statutory language, in its ordinary and in-context meaning, entails. It makes clear that the new standard rests on a concept different from mere lack of preferentiality. This is not to deny that discrimination in the price-lowering direction might be some evidence that a rate fails to be adequately remunerative: that a price is *discriminatorily* low can be an indication that the seller is subsidizing the beneficiaries of that price and not receiving adequate compensation. *See Maverick Tube*, 273 F. Supp. 3d at 1307 (discussing *Steel Wire Rod from Germany*, 62 Fed. Reg. 54,990, 54,994 (Dep't of Commerce Oct. 22, 1997)). But the absence of discrimination (even in a rate set forth in a consistent and discernible manner) logically does not itself establish that the government authority is receiving an adequately remunerative price, as Commerce recognized in *Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. at 43,196. That is not only the clear meaning of the language in the context of "benefit" and "subsidy," but the essential message of the congressional declaration that the earlier preferentiality standard was being replaced.

---

[7]    Under 19 U.S.C. § 1677(8), "Subsidies Agreement" refers to the Agreement on Subsidies and Countervailing Measures identified in 19 U.S.C. § 3511(d)(12) as "annexed to" the "WTO Agreement," which is the "Agreement Establishing the World Trade Organization entered into on April 15, 1994," 19 U.S.C. § 3501(9), to which was annexed the General Agreement on Tariffs and Trade [GATT], 19 U.S.C. § 3501(1)(B). The Subsidies Agreement was part of the Uruguay Round Agreements, which, with the Statement of Administrative Action, was approved by Congress in the URAA, § 101(a), 108 Stat. at 4814.

4

This court has already recognized, in a related context, that the "adequate remuneration" standard is tied to the value of what is being sold.  In *Delverde*, which involved sale of a subsidized business to Delverde, we considered whether Delverde was to be treated as the recipient of any part of the earlier subsidy, *see* 19 U.S.C. § 1677(5)(F) (change of ownership), in which case countervailing duties might apply to it.  *See* 202 F.3d at 1362–64.  We rejected Commerce's conclusive presumption of a pass-through of the seller's received subsidies and instead required a fact-specific inquiry into whether Delverde was, directly or indirectly, receiving "both a financial contribution and a benefit from a government."  *Id.* at 1364.  We linked the adequate-remuneration standard to payment of full value:

> Had Commerce fully examined the facts, it might have found that Delverde paid full value for the assets and thus received no benefit from the prior owner's subsidies, or Commerce might have found that Delverde did not pay full value and thus did indirectly receive a "financial contribution" and a "benefit" from the government by purchasing its assets from a subsidized company "for less than adequate remuneration."

*Id.* at 1368.

5

Commerce's broad position in this court finds no sound support in the regulation Commerce adopted in 1998 to implement the 1994 statutory standard, 19 C.F.R. § 351.511(a)(2).  Under the regulation, when, as in the present case, market prices under subparagraphs (i) and (ii) are not available for a comparative analysis, Commerce "will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles."  19 C.F.R. § 351.511(a)(2)(iii).  Nothing

about that language conveys a non-preferentiality standard like the broad position Commerce presses in this court, under which pricing need not be linked to value.

In fact, by the time Commerce adopted its regulation, Congress had codified the sensible recognition that "market principles" tie pricing to value. In the Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100-418, 102 Stat. 1107 (1988 Act), Congress added a provision regarding "nonmarket economy countries" to 19 U.S.C. § 1677. The new provision defines a "nonmarket economy country" to be "any foreign country that the administering authority determines does not operate *on market principles* of cost or pricing structures, so that sales of merchandise in such country *do not reflect the fair value of the merchandise*." 19 U.S.C. § 1677(18), added by 1988 Act, § 1316(b), 102 Stat. at 1187 (emphasis added). Since 1988, this court has repeatedly recognized the linking of "market principles" to "fair value." *See Magnesium Corp. of America v. United States*, 166 F.3d 1364, 1370 (Fed. Cir. 1999) ("By definition, in a non-market economy, the price of merchandise does not reflect its *fair value* because the market does not operate on market principles. *See* 19 U.S.C. § 1677(18) (defining non-market economy)."); *see also Viet I-Mei Frozen Foods Co. v. United States*, 839 F.3d 1099, 1101 (Fed. Cir. 2016); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1319 (Fed. Cir. 2010); *Dorbest Ltd. v. United States.*, 604 F.3d 1363, 1367 (Fed. Cir. 2010).

We see no sound basis for finding in 19 C.F.R. § 351.511(a)(2)(iii) a meaning different from the common-sense one already written into the statute by Congress when the regulation was adopted. Indeed, that meaning fits the place of subparagraph (iii) in the regulatory provision as specifying the residual method of implementing the statutory standard when the two primary methods are unavailable. The above-stated meaning of "market principles" sensibly treats the three methods as all of a piece, because the two primary methods of implementing the

statutory standard rely on competitive-market prices, which, as 19 U.S.C. § 1677(18) and our cases indicate, are tied to "fair value." *See also Verizon*, 535 U.S. at 505 (discussing role of costs in prices in competitive markets); *id.* at 543–44 (Breyer, J., concurring in part and dissenting in part) ("The traditional legal criteria of proper public utility rates have always borne a strong resemblance to the criteria of the competitive market in long-run equilibrium." (quoting 1 A. Kahn, Economics of Regulation: Principles and Institutions 63 (1988))).

Commerce did not call for a contrary standard when it promulgated the regulation. Commerce stated:

> [I]n situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles. Where the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination. We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case. In our experience, these types of analyses may be necessary for such goods or services as electricity, land leases, or water, and the circumstances of each case vary widely.

*Countervailing Duties*, 63 Fed. Reg. at 65,378 (citing *Pure Magnesium & Alloy Magnesium from Canada*, 57 Fed. Reg. 30,946 (Dep't Commerce July 13, 1992) (decided before 1994 Act, applying pre-1994 standard); *Steel Wire Rod from Venezuela*, 62 Fed. Reg. 55,014 (Dep't Commerce Oct.

22, 1997) (applying 1994 Act standard)).  That commentary does not give price discrimination anything more than an evidentiary role, and it does not repudiate the meaning of "market principles" Congress had already adopted.  Indeed, the commentary notes the special complexities of answering the question when the government is the sole seller, the very situation that rate-regulation law for utilities has long addressed, often by determining (to quote Commerce here) "costs (including rates of return sufficient to ensure future operations)."  63 Fed. Reg. at 65,378; *see Verizon*, 535 U.S. at 484.

For all the foregoing reasons, we reject, as outside the range of permissible meanings of the statute (and regulation), the government's broad position on what suffices to meet the standard of adequate remuneration.

B

We nevertheless uphold Commerce's decision about KEPCO's pricing in this case.  Commerce did not find only the absence of preferential rates.  It also found, and gave specific reasons for finding, that KEPCO's pricing met familiar standards of cost recovery.  J.A. 9028.  We have been shown no reversible error in Commerce's decision to rely on that combination of facts as sufficient to meet the "adequate remuneration" standard.

In our analysis rejecting the government's broad position, we have decided that nonpreferentiality of the sort the government stresses is insufficient to meet the statutory standard of adequate remuneration, which, along with its implementing regulation, requires ensuring that the government authority's price is not too low considering what the authority is selling.  That ruling is significant but limited in constraining Commerce.  We readily recognize that such a standard, while excluding the government's broad preferentiality position, leaves a large range of potential implementation choices.  One need only look outside the present statutory context to the familiar rate-regulation

context to see the great variety of methodologies used over time to ensure that rates of a monopoly provider are not too low, some directly focused on value (such as "fair value"), some on various measures of "cost" (which may reflect value). *Verizon*, 535 U.S. at 484–86; *see generally id.* at 477–89. Commerce has considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing-duty statute as well as practicality and other relevant considerations.

Here, we limit ourselves to saying that Nucor has not supplied a persuasive reason to conclude that Commerce's finding of cost recovery in this case was either legally incorrect or factually unsupported. As to the former, we note that Nucor has not argued that there is a crucial difference, for purposes of this case, between assessing market value and ensuring cost recovery. (Commerce suggested in *Certain Softwood Lumber Products from Canada*, 66 Fed. Reg. at 43,193, that there is such a difference as a conceptual matter and that the recipient's perspective might demand a focus on market value, making cost recovery insufficient.) Nor has Nucor, when focusing on KEPCO's costs, shown that Commerce failed to consider any category of cost that would have to be found recovered in order to meet the adequate remuneration standard. We express no view on whether Commerce's analysis in this case might have been vulnerable to arguments, about cost recovery or other matters, that Nucor has not presented and adequately developed.[8]

Only one objection by Nucor about evidentiary support warrants mention. Nucor contends that Commerce crucially erred in not giving weight to a Korean National

---

[8]     Our decision about the legal adequacy of Commerce's ultimate analysis is thus narrower than the dissent suggests.

Assembly report from 2012 that analyzed the Korean electricity market. J.A. 9028. Commerce found the report not relevant, because it was not about the period of investigation in this investigation, *i.e.*, calendar year 2014. J.A. 9029. Commerce also found that "[s]ince the date of the Report, 2012, KEPCO electricity industrial tariffs have been increased three different times." *Id.* We conclude that Commerce had an adequate basis for not relying on the 2012 report.

IV

Nucor's final argument is that Commerce committed reversible error by not considering the adequacy of the prices that KPX charged in relation to *its* costs, instead limiting the analysis to the prices that KEPCO charged in relation to *its* costs (which included what it paid to KPX). We agree with the Court of International Trade that this argument is in substance a contention that KPX is part of KEPCO as the "authority" whose prices Commerce had to analyze. *Nucor*, 286 F. Supp. 3d at 1375–77. We also agree that Nucor failed to exhaust this argument at the agency level, making it inappropriate for review in the Court of International Trade. *Id.* at 1377; *see, e.g.*, *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912–13 (Fed. Cir. 2017); *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007); *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003).

Commerce's preliminary decision referred only to KEPCO's costs. *See Preliminary Determination Memo*, J.A. 8909. Commerce explicitly analyzed who the relevant "authority" was, and it again referred only to KEPCO, never KPX. *See* J.A. 8907. Nucor was therefore sufficiently on notice of Commerce's limited focus. Yet it did not adequately raise the issue to Commerce in its case brief filed after the preliminary decision: Nucor mentioned KPX only in passing, J.A. 8954–55, and presented no meaningful argument that KPX was part of the "authority" or that

information about KPX's costs had to be requested and considered.  That is hardly enough to preserve an issue of this complexity.  *See, e.g.*, *Boomerang Tube*, 856 F.3d at 912–13.  In these circumstances, we see no error in finding failure to exhaust the issue.

## V

For the reasons stated, although we reject a broad position asserted by Commerce and partly relied on by the Court of International Trade, we find no reversible error in Commerce's decision, and we therefore affirm the Court of International Trade's judgment affirming that decision.

No costs.

**AFFIRMED**

# United States Court of Appeals
## for the Federal Circuit

---

**NUCOR CORPORATION,**
*Plaintiff-Appellant*

**ARCELORMITTAL USA LLC, AK STEEL
CORPORATION, UNITED STATES STEEL
CORPORATION,**
*Plaintiffs*

**v.**

**UNITED STATES, GOVERNMENT OF KOREA,**
*Defendants-Appellees*

**DONGKUK STEEL MILL CO., LTD.,**
*Defendant*

---

2018-1787

---

Appeal from the United States Court of International Trade in No. 1:16-cv-00164-CRK, Judge Claire R. Kelly.

---

REYNA, *Circuit Judge*, dissenting.

This is an important case of first impression. I agree with the majority on the important issue of whether the United States Department of Commerce may apply the preferentiality legal standard that has been repealed by Congress. It cannot. I conclude that the use of the repealed standard incurably taints the entirety of the underlying

countervailing duty investigation. Thus, I would vacate and remand on this basis.

The majority, however, affirms Commerce's final determination that the Korean government does not extend a countervailable subsidy in its provision of electric power to Korean CORE producers. I dissent from this part of the majority opinion. First, despite Commerce's use of a repealed standard, the majority theorizes that "adequate remuneration" exists because the Korean government purportedly recovers its costs to the extent it avoids bankruptcy. This novel theory is contrary to law and not supported by substantial evidence. Second, the majority affirms the U.S. Court of International Trade's judgment that Nucor failed to exhaust its argument concerning Commerce's decision not to include certain costs in its subsidy analysis, such as the costs of nuclear power generation. The administrative record, however, is replete with evidence that Nucor raised and argued those issues before Commerce. I would reverse the U.S. Court of International Trade and remand to Commerce for its consideration of those costs. For the reasons set out below, I dissent.

I.

Prior to passage of the Uruguay Round Administrative Act ("URAA"), U.S. trade law defined a countervailable subsidy as the provision of goods or services at "preferential rates." 19 U.S.C. § 1677(5)(A)(ii)(II) (1988). Loosely, preferential rates meant treatment more favorable to some than to others. At the start of the Uruguay Round negotiations, the U.S. government adopted as principal negotiating objective the replacement of the "preferentiality" standard with a standard more conducive to U.S. trade objectives. Consequently, as part of the Uruguay Round results package, the preferentiality standard was replaced with a "less than adequate remuneration" standard. URAA, Statement of Administrative Action, H.R. Doc. No. 103-316, vol.1, at 927 (1994) ("SAA"); *see* 19 U.S.C. §

1677(5)(E)(iv). Important to this case is that the SAA makes clear that in the provision of goods or services, the "less than adequate remuneration standard replaces the preferentiality standard."[1] SAA at 927. In *Certain Softwood Lumber Products from Canada*, Commerce addressed the then relatively new adequate remuneration standard, noting that "the government price must be compared with a market-determined price. It [was] no longer sufficient to say that the government does not discriminate among buyers[;] we must determine whether the government is receiving adequate remuneration, *i.e.* a market-based price." 66 Fed. Reg. 43,186, 43,196 (Dep't Commerce Aug. 17, 2001) (declaring that there are "important differences between the *discarded* preferentiality standard and the *current* adequate remuneration standard" (emphases added)).

More than two decades after Congress repealed the preferentiality standard in countervailing duty law, Commerce resurrects it. At the outset and throughout Commerce's adequate remuneration analysis, Commerce examined whether some or all Korean CORE producers received a preferential price. *See* J.A. 9023–24, 9025, 9026. The Government argues that Commerce was justified in applying the preferentiality standard because it did so in part only, and because under the facts of this case, it had no other way to reach a decision on whether the Korean CORE producers benefited from countervailable subsidies.[2] Appellee Br. 24–27. These arguments have no

---

[1] The SAA is more than mere guidance or explanation. The SAA forms part of the trade agreements package that Congress adopted as law in the passage of the URAA. 19 U.S.C. § 3512(d).

[2] This is not the first time that Commerce used the preferentiality standard post-URAA. Commerce, the Trade Court, and the majority all rely to some extent on *Maverick Tube Corp. v. United States*, 273 F. Supp. 3d

merit.  Commerce acted "well beyond the bounds of its statutory authority," i.e., contrary to law and the "clear unambiguously expressed intent of Congress," by knowingly applying a repealed legal standard.  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 326 (2014); *see also City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013) (stating that an agency's "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

I agree with the majority that Commerce improperly relied on the repealed preferentiality standard.  For example, the majority rejects the Government's "broad position" that a "preferential rate" analysis is proper under the statute.  Maj. Op. 11–12, 14, 18–19, 21, 24.  This alone compels vacatur and remand with instructions that Commerce undertake a countervailing duty analysis in view of the entirety of the record before it, applying the less than adequate remuneration standard required by the statute.

---

1293, 1307 (Ct. Int'l Trade 2017).  *See* Maj Op. 17.  Indeed, Commerce's final determination in this case mirrors the final determination in *Maverick Tube*.  But *Maverick Tube* is not controlling precedent and was not reviewed by this court.  In *Maverick Tube*, the Trade Court affirmed Commerce's interpretation of the countervailing duty statute, holding that the statute permitted continued reliance on the preferentiality standard.  *E.g.,* 273 F. Supp. 3d at 1307 ("Commerce's past experience shows that, in certain situations, preferentiality-like tests may be useful when determining the adequacy of remuneration.").  The case was appealed to this court and voluntarily dismissed prior to oral argument.  But as this court rules in this case, Commerce's reliance on the preferentiality standard is contrary to the statute.  *See* Maj. Op. 11.

II.

Once preferentiality is discarded, all that remains of Commerce's analysis is a limited technical discussion of how KEPCO distributed costs for the purpose of tariff rate proposals. This cursory cost recovery analysis is insufficient to support the conclusion that the electricity prices paid by Korean CORE producers are consistent with prevailing market conditions and the full value of the assets received.

The majority recognizes that the relevant standard is the adequate remuneration standard, which is focused on whether the Korean CORE producers paid the "full value" of the assets. Maj. Op. 18 (citing *Delverde, SrL v. United States*, 202 F.3d 1360, 1368, 1370 (Fed. Cir. 2000) (vacating and remanding because "Commerce's methodology for determining whether Delverde received a countervail[able] subsidy [was] invalid as being inconsistent with 19 U.S.C. § 1677(5)")). I agree that is the correct focus, but Commerce focused on something other than "full value" here.

The countervailing duty statute provides that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review." 19 U.S.C. § 1667(5)(E)(iv). "Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.* Yet Commerce did not determine how KEPCO's tariff schedule reflects prevailing market conditions. Commerce's cost recovery analysis in the *Final Determination Memo* is a nearly verbatim reproduction of its analysis in the *Preliminary Determination Memo*.[3] *Compare* J.A. 8909, *with* J.A.

---

[3] *See also Maverick Tube,* 273 F. Supp. 3d at 1302 (reviewing *Welded Line Pipe From the Republic of Korea:*

9028. This fact calls into question the extent to which Commerce actually considered or verified the evidence produced during the investigation. *Cf. CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1380 (Fed. Cir. 2016) (remanding to Commerce for failure to adequately explain its determination "to ensure that the agency's exercise of power adheres to the authorizing law and respects the record evidence.") In the background section of the opinion, the majority reproduces Commerce's analysis of KEPCO's standard pricing mechanism for setting its tariff rate schedule and simply affirms the negative countervailing duty determination on the basis that Commerce's analysis was sufficient evidence of adequate remuneration. Maj. Op. 7–8, 21.

The majority's conclusion that Commerce's analysis is reasonable and supported by substantial evidence lacks support both in law and the administrative record. For example, the majority holds that "KEPCO's pricing met familiar standards of cost recovery," but conducts no analysis of Commerce's methodology. *Id.* at 21. The majority does not explain what "familiar standards of cost recovery" means or how they are consistent with the statutory requirement that price setting be in accordance with prevailing market conditions. The majority constructs a theory that a government's tariff rates necessarily reflect market conditions because tariff rates are intended to recoup costs such that a government authority manages to stay in business. This theory or understanding is inconsistent with the fundamental purpose of U.S. countervailing duty law. It is also contrary to the record evidence.

--------

*Final Negative Countervailing Duty Determination*, 80 Fed. Reg. 61,365 (Dep't Commerce Oct. 13, 2015)). Commerce's analysis in *Maverick Tube* is also nearly verbatim to its analysis in this case. *See id.* at 1309–10.

The administrative record demonstrates that KEPCO is neither profitable nor that the Korean CORE producers paid the "full value" of the assets sold. As the Korean government explained, it controls the electricity market through majority ownership in KEPCO—solely a transmission and distribution entity—to implement national energy policy and further the public policy goals of the Korean government. J.A. 2543. The record shows that historically, electricity prices in Korea have "maintain[ed] the level lower than total cost"; electricity prices have been "excessively low," including around the period of investigation; and electricity prices have "not offset cost increase factors such as high fuel prices for generation." J.A. 3924. KEPCO's Form 20-F similarly highlights that the lengthy deliberative process required for approving increases in electricity tariffs in Korea may not adjust "to a level sufficient to ensure a fair rate of return" and may not offset "the adverse impact of . . . current or potential rises in fuel costs." J.A. 8949. Commerce failed to analyze or even discuss why this evidence is not relevant or persuasive, and the majority similarly fails to do so.

The record also demonstrates that the cost of generating electricity is the most significant cost in the provision of electricity services. *See* J.A. 8316 (showing cost attributed to generation to be approximately 90% of KEPCO's total cost in its provision of industrial electricity). Yet, as the majority acknowledges, Commerce's "analysis of costs did not include the costs of generating" electricity. Maj. Op. 8. When generation costs are explicitly not analyzed, it is unreasonable to assume that Commerce's analysis adequately supports the determination that KEPCO's pricing is consistent with prevailing market conditions. Here, substantial evidence in the administrative record demonstrates the opposite. For this reason, I conclude that Commerce's final determination is not supported by substantial evidence.

III.

Relevant to the adequacy of Commerce's cost recovery analysis is its decision not to include in the analysis the cost to generate the electricity sold by KPX to KEPCO. The majority agrees with the Trade Court that Nucor has not exhausted its arguments concerning KPX. Maj. Op. 23. The majority asserts that Nucor mentions KPX only in passing, which was not enough to preserve its related arguments on appeal. *Id.* The majority faults Nucor for not adequately developing arguments related to KPX in Nucor's case brief, yet Commerce's cost recovery analysis explicitly ignored Nucor's arguments, finding KPX's costs not "relevant." *Id.* at 9, 23.

Commerce, however, has an affirmative duty to investigate any appearance of a subsidy discovered during investigation. *See* 19 U.S.C. § 1677d; *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1150 (Ct. Int'l Trade 2000) (Wallach, J.). Additionally, the burden of production of evidence related to KPX was not on Nucor, but on the Korean Government as the party in possession of the information. *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002). "[T]he substantial evidence standard requires review of the entire administrative record," necessitating that "we consider both the trade court's prior decisions and [Commerce's] determinations, including 'the evidence presented to and the analysis by [Commerce].'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). The majority ignores portions of the administrative record, including the arguments Nucor made in its briefing to Commerce, and abdicates our responsibility to review Commerce's cost recovery analysis on the basis that the majority has "been shown no reversible error." Maj. Op. 21–22. The Government has not alleged non-cooperation on the part of Nucor. To the extent that Nucor has the burden to show the existence of a countervailable subsidy, Nucor pointed to the

documents it had and made those arguments. Commerce, not Nucor, failed in its duty here.

As the majority acknowledges, Commerce did not request costs of the Korean generators.[4] Maj. Op. 8–9. These costs would have included costs of generation, such as variable fuel prices and fixed facility construction costs. Commerce determined that only the costs to KEPCO, not the costs of the generators themselves, were relevant to price because KEPCO purchases electricity through KPX, which purchases from the generators. *See* J.A. 9028.

Nucor argued at length before Commerce why generation costs to KPX were relevant. *See* J.A. 8953–57. Commerce itself acknowledged in the *Final Determination Memo* that Nucor argued that "KEPCO's electricity tariff prices are not set in accordance with market principles" because the prices set by KPX do not reflect the "actual costs incurred by the nuclear generators." J.A. 9020. In explaining KPX's role, Nucor described how KEPCO's own Form 20-F explains that the Cost Evaluation Committee determines electricity prices in Korea through a cost-based pool system with fixed (capacity) and variable (marginal) cost components. J.A. 8953–54. The Cost Evaluation Committee is part of KPX. J.A. 911, 2546. Nucor then pointed out that KPX is 100% owned by KEPCO and its subsidiaries, and that KEPCO's Form 20-F also explains that KPX distributes purchase orders among generation units according to the "merit order system" that prioritizes generators with low variable costs, e.g., nuclear generators, irrespective of fixed costs. J.A. 8954.

---

[4] "Generators" refers to the generation units themselves, including nuclear generation units, which Nucor argued are the predominant source of electricity for Korean CORE producers. J.A. 9028.

Nucor also asserted before Commerce that the costs of energy, as determined by KPX's Cost Evaluation Committee, are "vitally important" to determining whether the CORE producers obtain their electricity according to market principles. J.A. 8954–55. Nucor argued that the prices set by KPX "grossly understate" the actual costs of generation for nuclear plants, which provide Korean CORE producers much of their electricity during off-peak hours when demand from other consumers is low, because the Cost Evaluation Committee assigned the same fixed price for "all generation units, regardless of fuel type used." J.A. 8955–56 (quoting KEPCO's Form 20-F (J.A. 2548)). Nucor argued that KPX's price-setting approach shifted the price of electricity away from accurately reflecting the cost of nuclear power generation because it has cheap "fuel" but also has per unit capital expenditures (fixed costs) three times those of thermal generation units. *Id.* Nucor contended that this approach results in a "gross distortion of electricity prices" for Korean CORE producers, which are among the principal users of nuclear power. *Id.*

An entity that is a 100%-owned subsidiary of the government is an "authority" under our countervailing duty laws. *See* 19 U.S.C. § 1677(5)(B) ("[T]he term 'authority' means a government of a country or *any public entity* within the territory of the country." (emphasis added)); *cf.*, *Guangdong Wireking Housewares & Hardware Co. v. United States*, 900 F. Supp. 2d 1362, 1376–77 (Ct. Int'l Trade 2013) ("Because the purpose of [countervailing duty] law is to offset the harm to domestic industries caused by foreign subsidies . . . it is reasonable for Commerce to attempt to detect and counteract all forms of foreign subsidies . . . . [including those] which are not provided directly by the government but instead pass through private or quasi-private channels."). Nucor presented both evidence and argument before Commerce that KPX was 100%-owned by KEPCO and that KPX was a public entity with a significant role in the supply of electric power.

The foregoing evidence, argued in detail by Nucor but not considered by Commerce, suggests that KPX and its Cost Evaluation Committee insulate KEPCO and the Korean CORE producers from the actual costs of generation, specifically for nuclear generators, by setting the identical capacity price for all generators, regardless of differing costs to generators of each fuel type. Additionally, KEPCO's Form 20-F states that KPX is a "statutory not-for-profit organization" responsible for setting the price of electricity in Korea. J.A. 2545. Thus, the electricity prices set by KPX in its not-for-profit role are highly relevant to the inquiry of whether the Korean government provides a direct or indirect countervailable subsidy to Korean CORE producers when the government provides the producers electricity. These circumstances undermine the argument or theory that tariff rate schedules necessarily reflect market conditions.

Yet, the majority and the Trade Court find a failure to exhaust on grounds that Nucor did not "meaningful[ly]" argue that KPX was part of the "authority" under § 1677(5)(B) or that "KPX's costs had to be requested and considered." Maj. Op. 23–24; *see also Nucor Corp. v. United States*, 286 F. Supp. 3d 1364, 1375–77 (Ct. Int'l Trade 2018). To the contrary, Nucor's arguments as to the relevance of KPX's costs and its role in providing a subsidy could hardly have been more explicit. Absent expressly using the word "authority" in describing KPX, Nucor did more than enough to raise these issues before Commerce; it made persuasive arguments.

Under these circumstances, the majority imposes nothing more than a mere semantic formality—one that deprives Nucor of its day in court, fails to protect domestic industry from material injury, and constitutes an unreasonable and unjust application of the doctrine of exhaustion. Where "nothing in the record suggests that any additional material from [plaintiff] would have been significant to Commerce's consideration of the issue or to later

judicial review," we have held that dismissal for failure to exhaust is inappropriate. *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013) (reversing the Trade Court where Commerce referenced and rejected plaintiff's position in the final decision and "nothing . . . hint[ed] at something significant that [plaintiff] could have said but did not."). Such is the case here.

Even if the doctrine of exhaustion reasonably applied, the circumstances here counsel against its application. When determining whether the exhaustion doctrine applies, the court must take into account not only agency interests but also "the interest of the individual in retaining prompt access to a federal judicial forum." *Itochu Bldg.*, 733 F.3d at 1145 (citing *McCarthy v. Madigan,* 503 U.S. 140, 145 (1992)). "Courts have recognized several recurring circumstances in which institutional interests are not sufficiently weighty or application of the doctrine would otherwise be unjust," such as (1) if additional filings with the agency would be ineffectual, and (2) if the issue before the court involves a pure question of law that can be addressed without further factual development. *Id.* at 1146; *see also Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013) ("Certain exceptions to the exhaustion requirement apply, such as where exhaustion would be a useless formality, or where the party had no opportunity to raise the issue before the agency." (internal quotation marks omitted)).

The majority demands a useless formality. Nucor does not assert new evidence or new facts on appeal. As discussed above, the record already contains evidence and argument that underlie the obvious conclusion that KPX is part of the relevant authority; no additional filings to establish that fact are needed. Nor can the Government feign surprise by asserting that KPX is an "authority," given the prominence of this issue in the *Maverick Tube* case. *See* 273 F. Supp. 3d at 1304–05.

A countervailing duty investigation, like an antidumping duty investigation, is an administrative investigation by a government agency; it is not an adversarial proceeding as is a court action. *See NEC Corp. v. United States*, 151 F.3d 1361, 1367 (Fed. Cir. 1998) (noting the "investigatory (versus adjudicatory) nature of the antidumping investigation"). Commerce collects information from a number of sources, including the petitioner, respondents, and governments, and bases its determinations on the record before it. Commerce should not be permitted to ignore its own record on the basis that a party "mentioned . . . only in passing" what the record loudly proclaims. Maj. Op. 23.

Indeed, 19 U.S.C. § 1671(a) provides that Commerce "shall" impose a countervailing duty if it determines that "any public entity" in a country is providing a subsidy. Allowing Commerce to hide behind the exhaustion doctrine based on a mere formality in this case undermines this statutory purpose of countervailing duty law. *See* Maj. Op. 14. The Government does not dispute that KPX is a public entity, only whether Nucor referred to it as an "authority." Applying the exhaustion doctrine under these circumstances does not serve its purpose because Commerce "not only has erred but has erred against objection made at the time appropriate under its practice" by making its unreasonable determination that Nucor's arguments regarding KPX were irrelevant. *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998). As such, judicial correction is appropriate. For these reasons, I conclude that the Trade Court's application of the exhaustion doctrine was an abuse of discretion. *See Itochu Bldg.*, 733 F.3d at 1145.

IV.

For the foregoing reasons, I would vacate the judgment of the Trade Court and remand to Commerce for further proceedings.