# United States Court of Appeals for the Federal Circuit

---

**POSCO,**
*Plaintiff*

v.

**UNITED STATES,**
*Defendant*

**STEEL DYNAMICS, INC., AK STEEL CORPORATION, ARCELORMITTAL USA LLC, UNITED STATES STEEL CORPORATION,**
*Intervenor-Defendants*

**NUCOR CORPORATION,**
*Intervenor-Defendant-Appellant*

------------------------------------------------------------

**NUCOR CORPORATION,**
*Plaintiff-Appellant*

**AK STEEL CORPORATION, ARCELORMITTAL USA LLC, UNITED STATES STEEL CORPORATION,**
*Intervenor-Plaintiffs*

v.

**UNITED STATES,**
*Defendant-Appellee*

**HYUNDAI STEEL COMPANY, POSCO,**

**GOVERNMENT OF KOREA,**

*Intervenor-Defendants*

————————————

2019-1213

————————————

Appeal from the United States Court of International Trade in Nos. 1:16-cv-00225-MAB, 1:16-cv-00226-MAB, Judge Mark A. Barnett.

————————————

Decided: October 15, 2020

————————————

ROBERT E. DEFRANCESCO, III, Wiley Rein, LLP, Washington, DC, argued for appellant. Also represented by TIMOTHY C. BRIGHTBILL, TESSA V. CAPELOTO, LAURA EL-SABAAWI, ALAN H. PRICE, ADAM MILAN TESLIK, CHRISTOPHER B. WELD.

KELLY A. KRYSTYNIAK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JEFFREY B. CLARK, JEANNE DAVIDSON, PATRICIA M. MCCARTHY; EMMA T. HUNTER, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, Washington, DC.

————————————

Before REYNA, TARANTO, and STOLL, *Circuit Judges.*

REYNA, *Circuit Judge.*

This appeal comes to us from the U.S. Court of International Trade. The Trade Court affirmed the U.S. Department of Commerce's final affirmative determination in the countervailing duty investigation on certain cold-rolled steel flat products from the Republic of Korea. Plaintiff-

Appellant Nucor Corporation challenges Commerce's final determination, raising two issues: first, whether Commerce's reliance on a preferential-rate standard to determine whether a conferred benefit is a countervailable subsidy is contrary to law and, second, whether Commerce's determination that the Government of Korea did not confer a benefit to Korean producers of cold-rolled steel flat products for less than adequate remuneration is contrary to law and unsupported by substantial evidence. We conclude that Commerce's final determination is contrary to law and unsupported by substantial evidence. We vacate and remand.

## BACKGROUND

### A. Countervailable Subsidies

Foreign governments subsidize their domestic industries when they provide financial assistance for the production, manufacture, or exportation of goods. 19 U.S.C. § 1677(5)(B). Generally, goods that have been provided countervailable subsidies are assessed countervailing duties upon their entry into the U.S. Customs territory. 19 U.S.C. § 1671(a). A subsidy becomes countervailable when an "authority," or the government of a country or any public entity within the territory of the country, provides a financial contribution in the form of goods or services that results in a "benefit" conferred to the recipient. *See* § 1677(5)(B). The U.S. trade statute provides that a "benefit shall normally be treated as conferred" when those goods or services "are provided for *less than adequate remuneration.*" § 1677(5)(E)(iv) (emphasis added). The statute provides that Commerce determines the "less than adequate remuneration" question by evaluating "prevailing market conditions for the good or service being provided" in the country that is subject to the investigation. § 1677(5)(E). Prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.*

When Congress enacted the Uruguay Round Agreements Act ("URAA") in 1994, it changed the definition of what constitutes a benefit conferred. Pub. L. No. 103-465, § 101, 108 Stat. 4809, 4814 (codified as 19 U.S.C. § 3511). Prior to the enactment of the URAA, the statute provided that an authority conferred a benefit when it provided a good or service at a "preferential rate." § 1677(5)(A)(ii)(II) (1988). "Preferential rate" means "more favorable to some within the relevant jurisdiction than to others within that jurisdiction."[1] As a result of the Uruguay Round negotiations and subsequent enactment of the URAA, Congress amended the statute and changed the standard for determining whether a benefit is conferred by expressly replacing "preferential rate" with "less than adequate remuneration." *See* § 1677(5)(E)(iv). Specifically, the amended statute provides that "a benefit shall normally be treated as conferred" where in the case of goods or services, such services (here, electricity) "are provided *for less* than adequate remuneration." *Id.* (emphasis added).

After enactment of the URAA, Commerce sought to develop a methodology for determining "adequacy of remuneration."[2] Commerce noted "[p]articular problems . . . in applying the [adequate-remuneration] standard when the government is the sole supplier of the good or service in the country or within the area where the respondent is

---

[1]    *Certain Softwood Prods. from Canada*, 48 Fed. Reg. 24,159, 24,167, 1983 WL 126683 (Dep't of Commerce May 31, 1983) (final negative countervailing duty determination) (*Softwood from Canada*).

[2]    Countervailing Duties: Final Rule, 63 Fed. Reg. 65,348, 65,377 (Dep't of Commerce Nov. 25, 1998) (CVD Preamble); *see also* Countervailing Duties: Proposed Rule, 62 Fed. Reg. 8,818 (Dep't of Commerce Feb. 26, 1997) (notice of proposed rulemaking and request for public comments) (1997 Proposed Rule).

located."[3]  Commerce found that these problems arise because "there may be no alternative market prices available" to use as a benchmark in its analysis. *Steel Wire Rod from Trinidad and Tobago*, 62 Fed. Reg. at 55,006.  To address these problems, Commerce developed a three-tier methodology to evaluate adequacy of remuneration. 19 C.F.R. § 351.511.  In Tier 1, Commerce compares the government price to a market-based price for the good or service under investigation in the country in question (a "Tier 1" analysis). § 351.511(a)(2)(i).  When an in-country, market-based price is unavailable, Commerce will compare the government price to a world-market price if the world-market price is available to purchasers in the country in question (a "Tier 2" analysis). § 351.511(a)(2)(ii).  When both an in-country, market-based price and a world-market price are unavailable, Commerce considers "whether the government price is consistent with market principles" (a "Tier 3" analysis). § 351.511(a)(2)(iii).  Under a Tier 3 analysis, if Commerce determines that government pricing is not consistent with market principles, then "a benefit shall normally be treated as conferred."    19 U.S.C. § 1677(5)(E)(iv).  Only Tier 3 is at issue in this appeal.

## B. The Investigation

On July 28, 2015, Commerce received requests for initiation of countervailing duty ("CVD") investigations on imports of certain cold-rolled steel flat products ("cold-rolled steel" or "CRS") from several countries including the Republic of Korea ("Korea").  *See* J.A. 1269.  Countervailing duty petitions were filed on behalf of AK Steel Corporation,

---

[3]    *Steel Wire Rod from Trinidad and Tobago*, 62 Fed. Reg. 55,003, 55,006–07 (Dep't of Commerce Oct. 22, 1997) (final affirmative countervailing duty determination); *Steel Wire Rod from Germany*, 62 Fed. Reg. 54,990, 54,994 (Dep't of Commerce Oct. 22, 1997) (final affirmative countervailing duty determination).

ArcelorMittal USA EEC, Nucor Corporation, Steel Dynamics, Inc., and United States Steel Corporation (collectively, "Petitioners"). *See id.* Petitioners alleged that the Government of Korea provided countervailable subsidies to Korean producers of CRS, and that imports of CRS from Korea were materially injuring, or threatening material injury to, an industry in the United States.[4]  J.A. 1269.  Petitioners alleged, inter alia, that the Korean government conferred a specific benefit on Korean CRS producers through the provision of a good or service—electricity—for less than adequate remuneration.  J.A. 353–76.

In August 2015, Commerce initiated a CVD investigation on CRS from Korea.  *See* J.A. 1269-1274; *see also* J.A. 109, J.A. 346-376.  The period of investigation encompassed January 1 to December 31, 2014.  J.A. 1269.  Commerce selected POSCO and Hyundai Steel Co., Ltd., as mandatory "respondents" for the investigation. J.A. 13034.  Commerce issued questionnaires requesting that the Korean government provide information about the Korean electricity industry and market, including the Korea Electric Power Corporation ("KEPCO"), which is a state-owned

---

[4]    Under U.S. trade law, countervailing duty investigations are concurrently conducted by Commerce and the U.S. International Trade Commission ("ITC").  Generally, Commerce determines whether any alleged subsidies are countervailable and the extent, if any, of applicable countervailing duty rates.  *See* 19 U.S.C. § 1671e(b) (Imposition of Duties); § 1677f-1(e) (Determination of Countervailable Subsidy Rate).  The ITC investigation determines whether U.S. industry is materially injured, or threatened with material injury, by reason of imported goods that have been deemed subject to countervailing duty rates.  *See* 19 U.S.C. § 1675b(a)(1) (Investigation by Commission Upon Request).  This appeal involves only the Commerce side of the investigation.

entity and the sole provider of electricity in Korea.  J.A. 13075, J.A. 1293, J.A. 12769.

In its questionnaire responses, the Korean government explained that electricity is generated by "[i]ndependent power generators, community energy systems, and KEPCO's six subsidiaries." *See* J.A. 18.  The Korean government further explained that all electricity generated in Korea, including that of private generators, must be sold to KEPCO in a wholesale market known as the Korea Power Exchange ("KPX"), which is wholly owned by KEPCO and its six subsidiaries.  J.A. 1300, J.A. 3137.  KEPCO then sells electricity to end users based on a tariff schedule that provides different rates for classes of consumers including industrial, residential, agricultural, and business users. J.A. 4437-4449.  The Korean government noted that the prices in KEPCO's tariff schedule are established in consultation with other Korean-government agencies, through a "lengthy deliberative process" that seeks the approval of the Ministry of Trade, Industry, and Energy, the Ministry of Strategy and Finance, and the Korea Energy Regulatory Commission.  J.A. 1296, J.A. 3111.  While KEPCO and other government entities establish the ultimate prices to end users, the basis of these prices is the cost of KEPCO's purchases from the KPX. J.A. 13083.  The Korean government reported in its questionnaire response that KPX is a wholly owned subsidiary of KEPCO and that all sales of electricity in Korea are administered by KPX.  *See* J.A. 18 n.17 (citing the Korean government's questionnaire response, Ex. E-3 at 31); *see also* J.A. 3111 (Ex. E-3, KEPCO Form 20-F, explaining that KEPCO "wholly own[s]" KPX).

In its preliminary determination, Commerce found that KEPCO, through its six subsidiaries, generates the "substantial majority of the electricity produced in Korea." J.A. 12769.  Commerce found that the Korean government regulates and approves electricity tariffs charged by KEPCO. *Id.*  Commerce further found that the Korean government "exercises significant control over KEPCO

through its majority ownership and pursues government policy objectives through KEPCO's business and operations." *Id.* Commerce therefore determined that KEPCO is an authority of the Korean government and that the Korean government is providing to producers of CRS "a financial contribution in the form of the provision of a good or service." *Id.* To determine whether that financial contribution constitutes a "benefit," Commerce conducted a Tier 3 analysis. J.A. 12772. In its analysis, Commerce started by considering KEPCO's "price-setting philosophy" by analyzing "electricity rates charged to the respondents to determine whether the price charged is consistent with KEPCO's standard pricing mechanism." *Id.* Commerce considered KEPCO's overall cost, including its "operational cost for generating and supplying electricity." *Id.* Commerce's analysis then turned on whether respondents were given preferential treatment:

> If the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other companies and industries which purchase comparable amounts of electricity, then there is no benefit.

*Id.* (citing *Pure Magnesium & Alloy Magnesium from Canada*, 57 Fed. Reg. 30,946 (Dep't Commerce July 13, 1992) (*Magnesium from Canada*)).

Commerce conducted verification of the Korean government's questionnaire responses in March 2016, but it did not verify the Korean government's provision of electricity for less than adequate remuneration. *See* J.A. 13075. Rather, Commerce relied on the verification it previously conducted in its investigation of corrosion-resistant steel ("CORE") from Korea, which is the subject of

Nucor Corporation's ("Nucor") appeal in *Nucor Corporation v. United States*, 927 F.3d 1243 (Fed. Cir. 2019).[5]

In its Final Determination, Commerce determined that, "consistent with 19 § CFR 351.511 and *Magnesium from Canada*," the Korean government provided respondents no benefit "because the prices charged to these respondents under the applicable industrial tariff were consistent with KEPCO's standard pricing mechanism." J.A. 13079 (Issue and Memorandum Decision accompanying *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 49,943 (Dep't Commerce July 29, 2016) (final affirmative determination, 2014)). Commerce found no evidence in the record suggesting that that respondents received preferential treatment over other industrial users of electricity that purchase comparable amounts of electricity. *Id.*

Commerce justified its reliance on a preferentiality standard despite the amendment of the Trade statute to replace preferential rate with adequate remuneration. J.A. 13079–80. Commerce opined that its regulations regarding the provision of a good or service, especially 19 C.F.R. § 351.511, were enacted as a result of the URAA and with reference to the methodology developed in *Magnesium from Canada*. *Id.* Commerce further reasoned that the CVD Preamble, which cites *Magnesium from Canada*, references "possible price discrimination" as one factor that the department may consider when assessing whether a government price is consistent with market principles. J.A. 13080. Commerce opined that the URAA's move away from preferentiality merely "flipped the regulatory hierarchy," promoting in-country, market prices and world-

---

[5]    In *Nucor*, Commerce did not obtain from the Korean government KPX's cost of generating electricity. 927 F.3d at 1247–48. KPX's costs were therefore not verified in the *Nucor* investigation.

market prices over price discrimination—i.e., the creation of Tiers 1–3. *Id.* Commerce suggested that a price discrimination analysis alone may be sufficient to assess adequate remuneration. J.A. 13081.

Commerce also addressed Petitioners' allegations that Commerce's analysis of electricity tariffs failed to include the full cost of generation, including, e.g., electricity from nuclear-power generators. J.A. 13083. Petitioners alleged that CRS producers purchase electricity predominantly during off-hours when electricity is primarily generated from nuclear-generation units. *See id.* Commerce noted that it did not request information regarding costs to electricity generators because the costs of electricity to KEPCO are determined by the KPX. *Id.* Commerce therefore found relevant only KEPCO's purchase price from the KPX and not the costs underlying KPX's price. *Id.* In particular, Commerce did not review quality, availability, marketability, transportation, or other conditions affecting KEPCO's purchase or sale of electricity from KPX.

Nucor appealed Commerce's final determination to the Trade Court. J.A. 13132-13181.

## C. U.S. Court of International Trade

On appeal, Nucor argued that Commerce's final determination is unlawful for three reasons. First, Nucor contended that Commerce erred in using preferentiality to determine whether a benefit was conferred to Korean producers of CRS. J.A. 13154. Second, Nucor argued that Commerce unreasonably excluded cost recovery when interpreting "adequate remuneration." J.A. 13160. Third, Nucor alleged that Commerce ignored arguments and evidence (e.g., that Commerce failed to account for KPX's role in setting KEPCO's tariff schedule) demonstrating that Korean electricity-price setting does not follow market principles. J.A. 13168-13174.

The trial court rejected all three challenges and found that Commerce's CVD determination was supported by substantial evidence and otherwise not contrary to law. J.A. 5–81. This appeal ensued. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review decisions of the Trade Court de novo. *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017). We apply the same standard of review used by the Trade Court in reviewing Commerce's determinations. *See* 19 U.S.C. § 1516(a)(b)(1)(B); *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013). We therefore review Commerce's final determination to assess whether it is supported by substantial evidence or otherwise contrary to law. *Union Steel*, 713 F.3d at 1106.

We address two issues on appeal: first, whether Commerce erred as a matter of law when it based its benefit-conferred analysis on a preferential-rate standard, and second, whether substantial evidence supports Commerce's finding that the Korean government does not provide a countervailable subsidy to respondents. Because Commerce's final determination is unsupported by substantial evidence and contrary to law, we vacate and remand.

### A. Adequate Remuneration

Commerce failed to properly measure less-than-adequate remuneration under post-URAA principles.

In *Nucor*, we addressed essentially the same issues raised in this appeal, including Commerce's reliance on the pre-URAA preferential-rate standard. 927 F.3d 1243. We rejected Commerce's "broad theory" that "if the foreign government authority engaged in a uniform, non-discriminatory, tariffed practice of charging a price so low that the authority consistently lost large sums of money in a way no private seller could sustain, sales pursuant to that practice would not be properly viewed as for 'less than adequate

remuneration.'" *Id.* at 1249. We concluded that the plain language of § 1677(5)(E), its context within the overall statutory scheme, its legislative history, and our related precedent did not support Commerce's reliance on a preferential-rate standard. *Id.* at 1249–54. We held that Commerce's "position is beyond any reasonable interpretation of the statute, or of its implementation regulation." *Id.* at 1249.

Our decision in *Nucor* issued on June 21, 2019, after the parties filed their briefs in this appeal. On June 26, 2019, Commerce filed a citation of supplemental authority advising the court of the *Nucor* decision and explaining that "Nucor's opening brief filed in this appeal is substantially identical to Nucor's opening brief filed in [*Nucor*]." ECF No. 39. Commerce also explained that the *Nucor* decision "pertains to nearly the entirety of [its] brief filed in this appeal on March 29, 2019." *Id.* In its response, Nucor clarified that the issue of "whether Commerce may lawfully apply an analysis of 'preferential rates' to measure 'adequate remuneration'" is identical in both cases. ECF No. 40. We conclude that Commerce's position on preferentiality here is identical to its position in *Nucor* and that our decision in *Nucor* rejecting Commerce's use of the preferentiality standard applies to this appeal.

As in *Nucor*, Commerce's use of the pre-URAA preferential-rates standard in this case is inconsistent with the adequate-remuneration standard under § 1677(5)(E)(iv). Commerce cannot rely on price discrimination to the exclusion of a thorough evaluation of fair-market principles to determine whether a recipient is receiving an unlawful benefit. *See Nucor*, 927 F.3d at 1251 (reasoning that "the existence of a 'benefit' of an unjustifiably low price . . . cannot depend on [a] finding that the producer is being discriminatorily favored compared to others in the exporting country").

In *Nucor*, we highlighted the Statement of Administrative Action, which provides that preferentiality be *replaced* with the new standard of less-than-adequate renumeration. 927 F.3d at 1252 (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1, at 927 (1994) ("SAA")). We noted that "[t]his authoritative interpretation confirms what the statutory language, in its ordinary and in-context meaning, entails. It makes clear that the new standard rests on a concept different from mere lack of preferentiality." *Id.* Thus, the words used in the statute, understood in their ordinary sense, make it unreasonable that lack of discrimination is sufficient to establish adequacy of remuneration. *See id.* at 1250.

Consistent with our holding in *Nucor*, we hold that Commerce's reliance on a preferential-rate standard is inconsistent with the Trade statute, in particular with the less-than-adequate-remuneration requirement, and is therefore contrary to law.

## B. Cost Recovery

Commerce's cost-recovery analysis is limited to a discussion of KEPCO's costs. *See* J.A. 13081–83. The limited analysis does not support its conclusion that electricity prices paid to KEPCO by respondents are consistent with prevailing market conditions because Commerce failed to evaluate KPX's impact on the Korean electricity market.

In *Nucor*, Plaintiff Nucor argued that Commerce erred by limiting the analysis to the prices that KEPCO charged in relation to its costs, which included the price paid to KPX, instead of considering the adequacy (less-than-adequate remuneration) of the prices that KPX charged in relation to its costs.. 927 F.3d at 1255. We agreed with the Trade Court's determination that Nucor's argument was, "in substance, a contention that KPX is part of KEPCO as the 'authority' whose prices Commerce had to analyze." *Id.* The Trade Court, however, concluded that Nucor "failed to

exhaust this argument at the agency level." *Id.* As a result, the Trade Court affirmed Commerce's final determination on this point. We agreed that Nucor failed to exhaust its KPX-related arguments and, as a result, our decision also did not address the KPX issue. *Id.*

In this appeal, Nucor again argues that Commerce erred by failing to consider KPX's impact on KEPCO's pricing. *See* Appellant Br. 36–47; *see also* J.A. 71–73 (Trade Court opinion rejecting Nucor's argument); J.A. 12898–914 (Nucor's Case Brief to Commerce addressing KPX's impact on KEPCO's electricity pricing). The government does not raise an exhaustion argument in this case, and we conclude that Nucor preserved this issue for appeal. *Cf. Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (applying the waiver doctrine but explaining that a party preserves an issue for appeal where it exhausts that issue before an administrative agency "so as to give a court the proper basis to review that issue on appeal").

Here, the administrative record does not support Commerce's determination that KEPCO is the only relevant entity for purposes of analyzing costs. J.A. 13083. To the contrary, evidence in the record suggests that KPX has a significant impact on KEPCO's pricing, and that Commerce failed to adequately investigate and consider KPX's impact on the Korean electricity market. For example, the record shows that all electricity generated in Korea must be sold to KEPCO by KPX (J.A. 1300, 3137); KPX is wholly owned by KEPCO and its six electricity-generation subsidiaries (*id.*); KEPCO bases its prices on the cost of its purchases from the KPX (*see* J.A. 13083); and KPX's pricing accounts for upwards of 90% of KEPCO's total cost (*see Nucor*, 927 F.3d at 1259 (Reyna, J., dissenting) (citing J.A. 8316, Letter from Yoon & Yang LLC to Sec'y Commerce, re: *Countervailing Duty Investigation: Certain Corrosion-Resistant Steel Products (CORE) from the Republic of Korea: Response to 2nd Supplemental Questionnaire* (Oct. 15, 2015))). That KPX's pricing constitutes a

significant portion of KEPCO's total cost makes it implausible that Commerce adequately investigated Korea's prevailing market condition for electricity without a thorough understanding of the costs associated with generating and acquiring that electricity.

Yet, Commerce did not request information regarding KPX's cost of electricity generation such as variable fuel prices, the construction and maintenance costs of a standard electricity generation unit, and the fixed costs of producing electricity (e.g., constructing facilities to generate electricity). Instead, Commerce determined that only the costs to KEPCO, not the costs associated with the generators themselves, were relevant to price because KEPCO purchases electricity through KPX, which purchases from the generators. *See* J.A. 13083. Commerce's determination that KPX was not relevant to its analysis leaves unresolved whether a benefit was conferred by way of the price charged by KPX to KEPCO. *See* § 1677-1; *see also* SAA at 927.

The government argues that "[n]othing in the statute requires Commerce to consider how the authority acquired the good or service that was later provided to respondents." Appellee Br. 35 (citation and internal quotation marks omitted). We disagree. Commerce has an affirmative duty to investigate any appearance of subsidies related to the investigation that are discovered during an investigation. *See* 19 U.S.C. § 1677d; *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1150 (Ct. Int'l Trade 2000). Section 1677(5) requires Commerce to evaluate subsidies "without regard to whether the subsidy is provided directly or indirectly on the manufacture, production, or export of merchandise," and it requires Commerce to consider the adequacy of remuneration "in relation to prevailing market conditions." § 1677(5)(C), (E). Here, Commerce failed to investigate an appearance of a potential subsidy that was disclosed during the investigation within the Korean

government's own questionnaire responses. *See* 19 U.S.C. § 1677d.

The government's argument assumes that KPX is not, itself, an authority of the Korean government. That assumption, however, is unsupported by the evidence. Under § 1677(5)(B)(iii), an authority is defined as "a government of a country or any public entity within the territory of the country." In *Guangdong Wireking Housewares & Hardware Co. v. United States*, the Trade Court affirmed Commerce's determination that certain wire-rod manufacturers under investigation were authorities under § 1677(5)(b) where the government of China held a majority ownership position in those wire-rod manufacturers. 900 F. Supp. 2d 1362, 1376–78 (Ct. Int'l Trade 2013). The court explained that § 1677(5)(B)'s "public entity" provision includes entities that are majority owned by a government and it relied on "Commerce's longstanding practice of treating most government-owned corporations as the government itself." *Id.* at 1376–77 (internal quotation marks omitted). Here, the Korean government's questionnaire response clarifies that KPX is a wholly owned subsidiary of KEPCO. J.A. 3111. There is no dispute that KEPCO is a state-owned entity and the sole provider of electricity in Korea. This evidence strongly suggests that KPX, like KEPCO, is an authority under § 1677(5)(B). Commerce disregarded this evidence when it assumed that it adequately accounted for KPX via the price paid by KEPCO. KPX is an authority. And Commerce's failure to treat KPX as an authority—or, at a minimum, investigate whether it is an authority—constitutes error as a matter of law. Because the role of KPX in the Korean electricity market remains unaddressed, Commerce's final determination is not supported by substantial evidence.

## CONCLUSION

We have considered the government's remaining arguments and find them unpersuasive. Because Commerce

improperly based its benefit-conferred analysis on a "preferential price" standard, we conclude that Commerce's final determination is contrary to law.  In addition, Commerce's failure to investigate and include KPX's generation costs in its analysis renders its final determination unsupported by substantial evidence.  We vacate and remand for further proceedings consistent with this opinion.

## VACATED AND REMANDED

### COSTS

Costs to Appellant.